IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


RONALD M. APPEL, RITA APPEL,  :  CIVIL ACTION
and NANETTE APPEL-BLOOM,       :
Individually and on Behalf     :
of all Others Similarly        :
Situated                       :
                               :
            v.                 :
                               :
GERALD S. KAUFMAN, et al.      :  NO. 08-392


MEMORANDUM AND ORDER


McLaughlin, J.                                    July 28, 2010


          This action is brought by three tenants-in-common of a

piece of property located at 401 North Broad Street,

Philadelphia.  In 1959, the property was purchased by a group of

promoters, referred to as "Nominees," who leased the land and the

building located on the land to the Terminal Commerce Building of

Philadelphia, Inc. for a term of 99 years.  The Nominees sold

interests in the property to approximately 600 tenants-in-common

and then took title and administered the business of the property

as nominees for the tenants-in-common.

          The plaintiffs challenge the right of the defendant

George Kaufman, who has been managing the property since 1969 and

acting as a "Nominee" of the property since 1977, to manage the

property and act as Nominee.  They accuse him of committing

several acts of fraud and of breaching his fiduciary duty to the

tenants-in-common.  They present their claims in four counts.

The first count alleges claims of fraud and breach of fiduciary duty against Mr. Kaufman; his deceased wife, Carol F. Kaufman; and the Gerald S. Kaufman Corporation (the "Kaufman defendants").[1]  The second count seeks an accounting and the appointment of a receiver to compel Mr. Kaufman and his corporation to account for their financial activities with respect to the property.  The third count requests a declaratory judgment invalidating the deeds granting Mr. Kaufman and his corporation title to the property as Nominee, as well as declaring null and void a mortgage on the property between Kaufman and defendant Norwest Bank Minnesota, now known as Wells Fargo Bank, N.A. (in the past, the Court and the parties have referred to this defendant as "Norwest;" for the purposes of this motion, however, the defendant will be referred to as "Wells Fargo").  Finally, the fourth count requests a partition of the property, in which the property will be sold and the proceeds of that sale will be paid out to the tenants-in-common.

The Kaufman defendants move for summary judgment on all counts.  Wells Fargo moves for summary judgment on count III. Their motions are limited to whether the plaintiffs' claims are barred by the applicable statutes of limitations or by the equitable doctrines of laches, waiver, estoppel or ratification,

---

[1]     The Kaufman defendants aver that Ms. Kaufman's estate has never been served in this action.

with the exception of the Kaufman defendants' request for summary judgment on the plaintiffs' partition claims.

The Court grants summary judgment for the defendants on all counts. The plaintiffs' claims under counts one, three, and four are barred by Pennsylvania's two-year statute of limitations for fraud. The plaintiffs' claims under count two are barred either by the six-year statute of limitations for an action at law for an accounting or by the equitable doctrine of laches.

I.   The Summary Judgment Record

The defendants' motions turn on whether certain correspondence exchanged between the parties and their associates gave the plaintiffs sufficient notice of their claims to begin the running of the applicable limitations periods. The facts of the correspondence are not in dispute. The Court will first describe the history of the parties' relationship with the Terminal Commerce Building as background. The Court then will provide the details of the parties' previous correspondence.

A.   Background

On September 1, 1959, Benjamin Kaufman, Nathan P. Jacobs, Samuel A. Seaver, Philip Kessler, and Arthur S. Mandelbaum (collectively the "original Nominees") formed an agreement (the "Agreement") between approximately 600

tenants-in-common (the "tenants-in-common") concerning the Terminal Commerce Building of Philadelphia, a property located at 401 North Broad Street, in Philadelphia, Pennsylvania (the "property"). Ex. C.[2] Under the terms of the Agreement, the original Nominees sold tenancy-in-common interests to the tenants-in-common for $5,000 each and took title to the property as nominees for the tenants-in-common.

The Agreement states that a 99-year lease was formed with the Terminal Commerce Building of Philadelphia as lessee (the "lease"). Under the agreement, the Nominees were responsible for the management of the property, including the collecting of rents under the lease and disbursing the proceeds to the tenants-in-common. The Agreement states that the property was purchased subject to a mortgage lien of approximately $4.4 million. The mortgage was refinanced at least two more times by the original Nominees, as reflected in a letter from Benjamin Kaufman to the tenants-in-common dated October 15, 1964, and a letter from Nathan Jacobs to the tenants-in-common dated May 5, 1978, respectively. Ex. Y.

Defendant George S. Kaufman, Benjamin Kaufman's son, took over the management of the property in or around 1969. From that point, the original Nominees paid him certain management

---

[2]   Unless otherwise stated, the exhibits referred to in this Memorandum are those attached to the Kaufman defendants' motion for summary judgment.

fees.  Upon his father's death in 1977, Mr. Kaufman assumed the role of Nominee in his father's place.  On or about May 2, 1983, the remaining original Nominees and Mr. Kaufman, acting on behalf of his father, deeded title to the property to Mr. Kaufman to hold as sole Nominee for the tenants-in-common, as reflected in a Quitclaim Deed and Nominee Agreement (the "Quitclaim deed") bearing that date.  Ex. W.  Mr. Kaufman drafted a letter, dated May 24, 1983, informing the tenants-in-common of the action.  Ex. Z.  The Quitclaim deed, however, was not recorded until August 27, 1992, when it was recorded with the Philadelphia County Department of Records at Deed Book 143, Page 145.  In 1999, Mr. Kaufman deeded title to the property to his corporation, the defendant Gerald S. Kaufman Corporation (the "Kaufman Corporation"), which thereafter acted as the sole Nominee for the tenants-in-common.  This deed was recorded with the Philadelphia County Department of Records on June 25, 1999, at Deed Book 1073, Page 310.

Also in 1999, Mr. Kaufman refinanced the property.  On or about June 17, 1999, the Kaufman Corporation entered into a loan transaction with Aries Capital Incorporated ("Aries"), whereby Aries made a loan to the Kaufman Corporation in the principal amount of $6.7 million; the Kaufman Corporation signed and delivered to Aries a mortgage note in that amount; and the Kaufman Corporation signed and delivered a Mortgage, Security

Agreement and Assignment of Leases and Rents to secure the amounts owed under the loan (the "Aries mortgage"). The Aries mortgage was recorded with the Philadelphia County Department of Records on June 25, 1999 at Mortgage Book 2066, Page 597. On July 15, 1999, Aries assigned the Aries mortgage to defendant Wells Fargo as trustee. The mortgage note matured by its terms in June 2009. Ex. AA.

Brothers Jack and Murray Appel were two of the original tenants-in-common. When Murray Appel passed away in 1982, he left his interest in the property to his wife, Sophie Appel. Upon her death in 1986, her children, Lee Appel and plaintiff Ronald Appel, inherited equal shares of her interest. Plaintiff Rita Appel is Lee Appel's widow, who inherited Lee Appel's interest after he passed away in September of 2007. When Jack Appel passed away in 1983, his widow, Emma Appel, inherited his interest. Upon her death in 1995, her children, Leonard Appel and plaintiff Nanette Appel-Bloom, inherited equal shares of her interest. Nanette Appel-Bloom inherited Leonard Appel's interest in the property when he passed away in 1998.

Nanette Appel-Bloom's husband, Cyrus J. Bloom, is counsel for the plaintiffs. Both Ronald Appel and Mr. Bloom are attorneys. Mr. Bloom began representing Ronald and Lee Appel in relation to the property no later than January 18, 2001. Deposition of Cyrus Bloom ("Bloom Dep.") at 10:6-11:4, attached

as exhibit E to Wells Fargo's motion for summary judgment.  He
represented his wife throughout their marriage.  Id. at
109:12-14.  Leonard Appel also discussed issues related to the
property with Mr. Bloom sometime in the late 1990s.  Id. at
74:23-75:25; 93:21-94:12.


    B.   The Parties' Correspondence

Plaintiff Ronald Appel, plaintiffs' counsel Mr. Bloom,
defendant Mr. Kaufman and Mr. Kaufman's accountant and attorney
engaged in a brief correspondence in 1997-1998, followed by a
longer period of correspondence in 2000-2001.  In a letter dated
October 22, 1997, Ronald Appel asked Mr. Kaufman's accountant,
Bruce Rosen, about certain management and professional fees
listed in a statement of income and expenses of the Terminal
Commerce Building for 1996.  Ex. D.  The letter asked Mr. Rosen
to advise Mr. Appel who received the payments and how they were
computed.  It also requested copies of income and expense
statements and federal partnership returns for the preceding
three years.  Mr. Appel wrote to Mr. Rosen again on January 12,
1998, stating that he never received the requested information
and that he was renewing that request.  Ex. E.

The next piece of correspondence provided by the
parties is a short memorandum, dated June 23, 2000, from Mr.
Kaufman to Mr. Bloom.  It stated that, per Mr. Bloom's request,

Mr. Kaufman supplied "a copy of the net lease with two amendments" and "three years' statements from the tax returns." Ex. F. Mr. Bloom replied on July 27, 2000. In that letter, Mr. Bloom requested more detailed financials and tax returns, explaining that the tax returns originally supplied were missing certain schedules. Mr. Bloom's letter inquired into the fact that the tax returns showed a mortgage loan of $221,261 at the beginning of the year, whereas at the end of the year they showed a mortgage loan of $2,978,463.[3] The letter asked Mr. Kaufman to supply the reason for the loan, the party to whom the loan was made, the principals/owners of the borrower, the party who arranged for the loan on behalf of the borrower, the security for the loan, and queried why any "unneeded cash" held by the partnership was not distributed to the partners.[4] Ex. G.

Mr. Kaufman faxed a memorandum to Mr. Bloom, dated August 16, 2000. In the fax, he said that he had given Mr.

---

[3] The plaintiffs' complaint references a mortgage in the amount of $6.7 million, while the correspondence discusses a mortgage loan in the amount of $2.9 million. The Affidavit of George S. Kaufman, included with the Kaufman defendants' motion, explains the discrepancy. Kaufman Aff. at ¶ 24. Mr. Kaufman explains that, of the total $6.7 million loan secured by the Aries mortgage, approximately $3.7 million was used to repay mortgage loans burdening the property. Closing costs and pre-paid expenses added up to approximately $306,000, and approximately $2.5 million was loaned to the tenant to refurbish the property, at a rate of interest approximately 1.7% above the rate of interest on the mortgage loan. Id.; see also Ex. AA.

[4] The parties use the term "partners" to refer to the tenants-in-common throughout their correspondence.

Bloom's letter to Mr. Rosen who was instructed to collect "what you need and answer your questions." The fax also answered Mr. Bloom's questions about the mortgage. It explained that the lease allows the tenant to require the owner to mortgage the property for up to $750,000 and to lend the tenant the proceeds for the upkeep of the building. The letter explained that this had been done some years before and the loan had been paid down to $221,261 by 1999. Mr. Kaufman explained that, at that point, he had refinanced the property, increasing the mortgage debt to $2,9000,000, and lent the money to the tenant. The tenant then used the funds to prepare the building to lease to telecom companies. The letter also explained that there was "no basis for calling this a limited partnership," because it was a "co-tenancy." Ex. H. Mr. Rosen gave itemized answers to the rest of Mr. Bloom's questions in a letter to Mr. Bloom dated September 28, 2000. The letter states that complete tax returns for 1996, 1997 and 1998, except for the partner's K-1 forms, were enclosed. Ex. I.

In December 5, 2000, Mr. Kaufman issued an "Update Report" to the investors. It explained the current status of the lease. The report stated that "[w]e will continue to pay distributions to the partners and reduce our mortgage loan." The report speculated that, "in the not-too-distant future," the loan would either be paid off, doubling the distributions to the

partners, or Mr. Kaufman would refinance and distribute the proceeds "for the fourth or fifth time."  Ex. J.

Mr. Bloom responded in a letter dated December 7, 2000. The letter recognized that Mr. Rosen did supply complete tax returns for the years 1997, 1998 and 1999.  Mr. Bloom, however, stated that he had not received detailed financial statements for those years.  He also stated that what he had received raised "some disturbing questions."  Specifically, among other questions concerning the management of the tenancy, the letter questions Mr. Kaufman's justification for being paid $201,000 in management fees for the three years in question.  The letter also questioned why the mortgage was increased to $2.9 million, how many times the tenant can require the owner to mortgage the property, the identity of the principals/owners of the tenant, and whether Mr. Kaufman or any member of his family, had a direct or indirect interest ownership or other financial interest in the tenant. Ex. K.

Mr. Bloom sent another letter on January 18, 2001.  In that letter, Mr. Bloom stated that he did not receive a response to his December 7, 2000, letter.  The letter demanded copies of detailed financial statements for the years 1997-2000.  It also demanded, "[o]n behalf of my wife, Nanette Bloom, and Ronald and Lee Appel, tenants in common of Terminal Commerce Building," that Mr. Kaufman "repay all management fees at any time directly or

indirectly paid to you," that Mr. Kaufman distribute such fees to the tenants-in-common and that he cease payment of future management fees. The letter also demanded an accounting, requesting that Mr. Kaufman "fully account for your activities from the time that you assumed the management of the forgoing property." Plaintiff Ronald Appel was cc'd on the letter. Ex. L.

The next letter was from Michael Feinstein, Mr. Kaufman's attorney. In that letter, dated February 7, 2001, Mr. Feinstein stated that Mr. Bloom's letter provided no justification for a full accounting and itemized the information that Mr. Rosen and Mr. Kaufman had already provided. The letter stated that, if Mr. Bloom could "demonstrate a legitimate reason why Mr. Kaufman should provide [additional information], any such request will be taken under advisement." Ex. M.

Mr. Bloom replied on February 15, 2001. His letter stated that Mr. Feinstein's letter was "an invitation to litigation, which, if it becomes necessary, would likely be in the form of a class action on behalf of all investors/tenants in common." The letter reiterated that the tax returns supplied by Mr. Rosen raised "disturbing questions." The letter also askes "[b]y what authority, and by what documents signed by the investors, is [Mr. Kaufman] [the] nominee, and with what rights and powers?" Ex. N. In a follow-up letter dated March 12, 2001,

Mr. Bloom stated that he had not heard from Mr. Feinstein or Mr. Kaufman in response to his February 15 letter.  Mr. Bloom stated that "we are in the process of consulting with counsel in Philadelphia . . . with a view to instituting appropriate legal action."  Ex. O.

Mr. Feinstein responded in a letter dated March 13, 2001.  The letter stated that Mr. Kaufman is paid a management fee of only $42,000 a year.  A memorandum to Mr. Bloom from Mr. Kaufman, dated March 6, 2001, was enclosed with the letter.  The memorandum explained, in detail, the nature of the management fees and why Mr. Kaufman was paid $201,000 for the years in question.

Mr. Feinstein's letter also answered Mr. Bloom's question about the source of Mr. Kaufman's authority as Nominee. He referred to the 1959 Agreement, stating that "if, as you allege, your wife originally inherited her interest in the Company from her father, she should know that the Company's Tenancy in Common Agreement designated [the original Nominees] for all the tenants in common."  It further stated that the Kaufman Corporation is the successor to all original Nominees. The letter also reiterated Mr. Kaufman's position that Mr. Bloom failed to assert a legitimate basis for Mr. Kaufman to provide an accounting.  It did, however, invite Mr. Bloom, with proper authority of a record owner of interest, to review the books and

records of the Kaufman Corporation in its offices in Chicago, Illinois.  Ex. P.

Mr. Bloom replied on March 22, 2001, the final letter in the parties' correspondence.  He stated that Mr. Feinstein's letter failed to explain "by what authority, and by what documents signed by all of the investors,[Mr. Kaufman] is, or has the right to be, [the] nominee, and with what rights and powers." The letter stated that, "[i]n the present posture, I can only conclude that Mr. Kaufman is an interloper with no authority whatsoever to act, or to do anything, on behalf of the tenants in common, or to take any management fees in any amount."  The letter also stated that, "[b]ecause of his failure to answer [the relevant question from the December 7, 2000, letter], I must conclude that [Mr. Kaufman] or one or more members of his family has a direct or indirect ownership or other financial interest in the tenant."  The letter rejected the offer to review the records of the Kaufman Corporation, because, among other reasons, the letter provided no explanation as to the existence of the corporation.  The letter stated Mr. Bloom's opinion that the offer was nothing more than "a smoke screen" for Mr. Kaufman's refusal to supply copies of the financial statements.  Ex. Q.

## II.  Procedural History

The plaintiffs filed their complaint in the Court of Common Pleas of Philadelphia County, Pennsylvania, on November 27, 2007, and alleged claims, on behalf of themselves and others similarly situated, against Mr. Kaufman alone.  Mr. Kaufman filed a notice of removal on January 25, 2008.  The case was placed into suspense from May 30, 2008 until November 12, 2008, while the parties pursued settlement discussions.  The plaintiffs amended their complaint on November 17, 2008.  The amended complaint added the Kaufman Corporation, Ms. Kaufman, Aries, and Norwest Bank Minnesota as defendants.

Gerald Kaufman filed a motion to dismiss the amended complaint on December 15, 2008.  Wells Fargo filed a motion to dismiss Count III of the amended complaint on January 9, 2009. In an Order dated March 2, 2009, the Court stayed discovery pending its decision on the defendants' motions to dismiss.  The Kaufman defendants argued three grounds for dismissal in their motion: (1) that the Agreement itself barred the plaintiffs' partition request, (2) that the applicable statutes of limitations barred the plaintiffs from seeking relief for their breach of fiduciary duty and fraud claims, their claims seeking nullification of the deeds and mortgage, and their request for an accounting; and (3) that the plaintiffs lacked standing to assert claims that arose before they acquired their tenancies-in-common.

Wells Fargo argued that the plaintiffs' request for a declaratory judgment rendering the mortgage void was barred by the applicable statute of limitations.

In a Memorandum and Order dated March 12, 2009, the Court denied the defendants' motions to dismiss without prejudice. The Court found that the plaintiffs had adequately stated a claim on all counts. The Court, however, stated that discovery may provide evidence supporting the defendants' arguments and the defendants may reassert their arguments at the close of fact discovery. In an Order dated May 11, 2009, the Court granted Aries' motion to be dismissed as a defendant in the action. The Court found that Aries had completely assigned the mortgage to Wells Fargo and that Aries no longer had any claim to or interest in the mortgage.

The Court held a Rule 16 conference with the parties on June 11, 2009, to discuss how to proceed with the case. In an Order of that date, the Court ordered the parties to proceed with limited discovery relating to the issues of whether any applicable statutes of limitations or equitable defenses such as laches, ratification, estoppel or waiver, barred the plaintiffs' claims. After a separate telephone conference with the parties, the Court also referred the case for settlement discussions with Magistrate Judge Elizabeth T. Hey.

On July 9, 2009, the Kaufman defendants filed a motion to amend their answer to the amended complaint, in part to assert a counterclaim against the plaintiffs with regard to the plaintiffs' partition claim. The Court granted that motion and the Kaufman defendants filed their amended answer on August 26, 2009.

The plaintiffs filed a motion for partial summary judgment on June 17, 2009. The motion sought summary judgment against the Kaufman defendants under the second count of the amended complaint, the plaintiffs' request for an accounting and receivership. The Court denied the plaintiffs' motion in an Order dated October 13, 2009. Part of the plaintiffs' accounting request had been rendered moot because the Kaufman defendants had provided the plaintiffs with an accounting for the prior six years. The Court stated that it would consider the rest of the plaintiffs' accounting claim with the defendants' motions for summary judgment. The plaintiffs also moved to file a second amended complaint on September 30, 2009. The Court denied that motion in an Order dated October 21, 2009, finding that amendment would delay the resolution of the case and prejudice the defendants.

During the period of limited discovery, the parties filed several motions to compel discovery and motions for protective orders. Included in these motions was a motion from

the plaintiffs, filed on October 13, 2009, requesting the Court
to compel the Kaufman defendants to produce discovery.  The
plaintiffs alleged that the Kaufman defendants had failed to
answer interrogatories and failed to produce several requested
documents.  The Court denied the motion in an Order dated
November 12, 2009.  The Court stated that it was persuaded that
the defendants had produced the discovery called for by the
Court's June 11 Order.  The Court stated that, if, in responding
to the defendants' summary judgment motion, the plaintiffs
believed they needed additional discovery to meet the defendants'
statement of the facts, they could file an affidavit pursuant to
Rule 56(f) of the Federal Rules of Civil Procedure.

        The defendants filed their motions for summary judgment
on January 21, 2010.  The Kaufman defendants moved for summary
judgment on all counts.  Wells Fargo moved for summary judgment
on the third count of the plaintiffs' amended complaint.

        On January 26, 2010, the plaintiffs filed an affidavit
of Cyrus Bloom pursuant to Rule 56(f) of the Federal Rules of
Civil Procedure that stated that, in order to respond to the
Kaufman defendants' motion for summary judgment and the
accompanying affidavit of Gerald Kaufman (the "Kaufman
affidavit"), the plaintiffs needed to take Gerald Kaufman's
deposition.  Viewing the plaintiffs' Rule 56(f) affidavit as a
response to their motion for summary judgment, the Kaufman

defendants filed a reply brief in support of their motion on February 2, 2010.

Also on January 26, 2010, the plaintiffs filed a motion for summary judgment against Wells Fargo under the third count of the amended complaint, asking the Court to declare the mortgage between Kaufman and Wells Fargo null and void. Wells Fargo filed an emergency motion to strike the plaintiffs' motion for summary judgment. In an Order dated February 2, 2010, the Court denied the request to strike the plaintiffs' motion and, instead, ordered that Wells Fargo was not to respond to the plaintiffs' motion unless and until the Court ordered it to do so. On February 9, 2010, the plaintiffs filed another motion for partial summary judgment on the third count of the amended complaint, this time against the Kaufman defendants. In an Order dated February 17, 2010, upon an emergency motion for the Kaufman defendants to stay the time to respond to that motion, the Court also ordered that the Kaufman defendants did not need to respond to the plaintiffs' motion unless and until the Court ordered it to do so.

On February 17, 2010, the plaintiffs moved to strike the Kaufman affidavit on the ground that it contained facts that were not based on Mr. Kaufman's personal knowledge. The plaintiffs also requested sanctions for the filing of the affidavit. The Kaufman defendants filed a motion for sanctions

pursuant to Rule 11 of the Federal Rules of Civil Procedure against Mr. Bloom, and argued that the plaintiffs' motion was an improper sur-reply to the Kaufman defendants' motion for summary judgment.

In an Order dated April 12, 2010, the Court denied both of the motions. The Court found that sanctions were not warranted. The Court also stated that it would not strike Mr. Kaufman's affidavit but would consider only the facts stated in Mr. Kaufman's affidavit that are based on his own personal knowledge. The Court also recognized that the plaintiffs had not responded to the Kaufman defendants' motion for summary judgment. The Court ordered the plaintiffs to do so within two weeks of the Court's Order. The Kaufman defendants were granted one week to file a brief in reply.

On June 9, 2010, the plaintiffs filed a motion to dismiss the pleadings and defenses of the Kaufman defendants on the ground that Mr. Kaufman committed perjury in statements made in his affidavit. The plaintiffs also requested that the Court order sanctions against Mr. Kaufman's counsel for their complicity in the alleged perjury. In a letter dated June 14, 2010, the Kaufman defendants requested that the Court hold the plaintiffs' motion in abeyance until the Court decided the defendants' motions for summary judgment. The Court granted the Kaufman defendants' request in an Order of that date.

The Court held oral argument on the defendants' motions for summary judgment on June 24, 2010.

III. <u>Analysis</u>

The Court will first discuss the plaintiffs' request to continue the Kaufman defendants' motion for summary judgment pursuant to Rule 56(f) in order to take Mr. Kaufman's deposition. The Court then presents its analysis of the defendants' arguments for summary judgment on the plaintiffs' claims in the order that the counts are alleged in the amended complaint.

A. <u>The Plaintiffs' Rule 56(f) Affidavit</u>

In their Rule 56(f) affidavit, the plaintiffs argue that they needed to depose defendant George Kaufman before responding to the Kaufman defendants' motion for summary judgment. Rule 56(f)(2) provides that, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken."

The Court denies the plaintiffs' request to continue the summary judgment motion. First, the defendants aver that they offered to present Mr. Kaufman for deposition on numerous

occasions but the plaintiffs refused on the ground that the
defendants had not responded to their requests for written
discovery.  Second, the deposition is not necessary to decide the
Kaufman defendants' motion because the motion concerns what the
plaintiffs and their counsel knew or should have known from the
parties' previous correspondence, not what Mr. Kaufman knew at
the time.

B.  Fraud and Breach of Fiduciary Duty

The plaintiffs allege that the Kaufman defendants
committed fraud and breached their fiduciary duty to the tenants-
in-common.  Their allegations fall into the following general
categories:  (1) that Mr. Kaufman and the Kaufman Corporation
wrongfully assumed the role of Nominee, (2) that Mr. Kaufman paid
himself management fees that were not permitted under the
Agreement, (3) that the Kaufman defendants mortgaged the property
without authority and for undisclosed purposes, (4) that the
Kaufman defendants maintained a financial interest in the tenant
in conflict with the interests of the tenants-in-common, and (5)
the Kaufman defendants failed to pay the tenants-in-common in
amounts equal to the net rents collected.[5]

---

[5]     The plaintiffs' specific allegations are that the
Kaufman defendants committed fraud and breached their fiduciary
duty by (1) collecting the rents and making distributions to the
tenants-in-common in amounts less than the net rents, (2) paying
Mr. Kaufman management fees, (3) placing mortgages on the
property for unknown purposes, (4) making loans to the property's

All of these claims are barred by Pennsylvania's two-year statute of limitations for fraud, 42 Pa. C.S. 5524(7).[6]  This statute of limitations began to run, at the latest, in March of 2001, upon the completion of the parties' 2000-2001 correspondence.  The limitations period, therefore, expired in March of 2003.  The plaintiffs do not state any separate causes of action for fraud or breach of a fiduciary duty that occur within the limitations period.

In the case of an express trust, such as this one, the general principle under Pennsylvania law is that "[t]he statute of limitations begins to run against the trust beneficiary with respect to a suit against the express trustee, if at all, when he knows the trust has been repudiated or reasonably should have known it."  United States v. Rose, 346 F.2d 985, 989-90 (3d Cir. 1965); Pa. Co. for Ins. Lives and Granting Annuities v. Ninth Bank & Trust Co., 158 A. 251, 154 (Pa. 1932) ("Pennsyvania Co.").  This generally means that the statute of limitations begins to

---

tenant and others, (5) paying taxes and other charges required by the lease to be paid by the tenant, (6) making other expenditures for unknown purposes, (7) holding money in "escrow" for no known reason, and (8) maintaining a financial interest in the tenant in conflict with the interests of the plaintiffs and the other tenants-in-common and in violation of the fiduciary obligations assumed by him or imposed upon him by law.

[6]    The statute provides, in relevant part, that any "action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter" is subject to a two-year period of limitations.  42 Pa. C.S. 5524(7).

run when the trustee openly and unequivocally violates his

duties.[7]  <u>Weis-Buy Services, Inc. v. Paglia</u>, 411 F.3d 415, 422 (3d

Cir. 2005) (<u>citing</u> <u>Philippi v. Philippe</u>, 115 U.S. 151 (1885)).

     The plaintiffs argue that, because Kaufman has never

openly repudiated the trust, they never knew of a repudiation and

the statute has never begun to run.  In support of that argument,

the plaintiffs cite to the Supreme Court of Pennsylvania's

statement in <u>Pennsylvania Co.</u> that the statute of limitations

"does not begin to run in favor of an express trustee who has

repudiated his trust until knowledge of the repudiation has been

brought home to the cestui que trust."  <u>Pa. Co. for Ins. on Lives</u>

<u>and Granting Annuities v. Ninth Bank & Trust Co.</u>, 158 A. 251, 154

(Pa. 1932).

     That statement, however, is best read in context.  The

full paragraph reads

> The statute of limitations applies to all
> cases at law and in the orphans' court, and
> to all cases in equity except those technical
> and continuing trusts over which equity has
> exclusive jurisdiction. . . . <u>But the</u>
> <u>statute, however, does not begin to run in</u>
> <u>favor of a participant in a breach of trust</u>
> <u>until the discovery of the fraud; that is,</u>
> <u>until the cestui knows, or under the</u>
> <u>circumstances ought to know, of the facts</u>
> <u>that give rise to his cause of action.</u>  It
> does not begin to run in favor of an express
> trustee who has repudiated his trust until

---

    [7]   Mr. Kaufman is either the trustee of the property by
nature of his status as Nominee, or, as the plaintiffs' assert,
trustee <u>ex</u> <u>maleficio</u>.  Either way, he owes the same fiduciary
obligations to the tenants.  <u>Pennsylvania Co.</u>, 158 A. at 253.

> knowledge of the repudiation has been brought
> home to the cestui que trust.  And in actions
> based upon fraud, where the fraud has been
> actively concealed, or where a relationship
> of trust and confidence exists, it does not
> begin to run until the discovery of the
> fraud.

Id. (emphasis added).  In the case of fraud, therefore, the

statute begins to run when the fraud has been discovered, or when

the "cestui knows, or under the circumstances ought to know, of

the facts that give rise to his cause of action."  This rule has

been codified at 42 Pa. C.S. § 5532(c), which provides that

> [i]n the case of a civil action or proceeding
> against the trustee of an express or implied
> trust, the time within which such an action
> or proceeding by or on behalf of a
> beneficiary on account of fraud must be
> commenced shall be computed from the
> discovery of the fraud, or when, by
> reasonable diligence, the person defrauded
> might have discovered the fraud.

In this case, therefore, the question is whether the plaintiffs

discovered or, by reasonable diligence, might have discovered

their claims of fraud and breach of fiduciary duty through the

2000-2001 correspondence.

Reasonable diligence is an objective standard.  Cochran

v. GAF Corporation, 666 A.2d 245, 217 (Pa. 1995).  Under that

standard, a plaintiff's actions are evaluated to determine

whether he "exhibited those qualities of attention, knowledge,

intelligence and judgment which society requires of its members

for the protection of their own interests and the interests of

others." <u>Kach v. Hose</u>, 589 F.3d 626, 642 (3d Cir. 2009). The burden is on the plaintiff to show reasonable diligence. <u>Id.</u> Although reasonable diligence is often a factual issue for a jury to decide, "when reasonable minds would not differ that the plaintiff has failed to exercise due diligence in ascertaining the existence of his injury, the court can decide the matter rather than submit it to the jury." <u>Id.</u>

Under these circumstances, no reasonable finder of fact could conclude that the plaintiffs exercised reasonable diligence in pursuing their fraud and breach of fiduciary duty claims. The plaintiffs, in their own correspondence, raised the very questions that serve as the basis for each of the fraud allegations made in the amended complaint. Once the plaintiffs were aware of such concerns, they had a duty to exercise reasonable diligence in pursuing any causes of action arising out of the alleged fraudulent acts.

The plaintiffs have questioned Mr. Kaufman's status as a legitimate nominee since at least February 15, 2001. In his letter of that date, Mr. Bloom asked by what authority and by what document, signed by the investors, Mr. Kaufman assumed the role of nominee, and with what rights and powers. In his letter dated March 22, 2001, Mr. Bloom concluded that Mr. Kaufman is "an interloper" with no authority whatsoever to act, or to do

anything, on behalf of the tenants-in common, or to take any management fees in any amount.

Nor was this the first time the plaintiffs had raised the question of Mr. Kaufman's management fees. The plaintiffs' questioning of Mr. Kaufman's receipt of management fees date back to, at least, plaintiff Ronald Appel's letter of October 22, 1997. In the January 18, 2001, correspondence, Mr. Bloom demanded, "on behalf of my wife, Nanette Bloom, and Ronald Appel and Lee Appel," that Mr. Kaufman repay all management fees and distribute them to the tenants-in-common, cease payment of the management fees, and fully account for all of his activities.[8]

The plaintiffs have also questioned Mr. Kaufman's right to mortgage the property since, at least, July 27, 2000. In the correspondence of that date, Mr. Bloom asked several pointed questions concerning the mortgage loan that was eventually revealed to be the Aries mortgage. In his letter dated August 16, 2000, Mr. Kaufman responded with answers to those questions. In his letter dated December 7, 2000, however, Mr. Bloom asked additional questions concerning the mortgage.

The plaintiffs questioned whether Mr. Kaufman has maintained a financial interest in the tenant in conflict with the interests of the plaintiffs and the other tenants-in-common

_____

[8]     Mr. Kaufman states in his affidavit that he has not received management fees for approximately 6.5 years. He received his last management fee on June 1, 2003. Kaufman Aff. at ¶ 26 & n.19.

since, at least, Mr. Bloom's letter of December 7, 2000. In his letter of March 22, 2001, Mr. Bloom stated that, because Mr. Kaufman failed to answer his question, he must conclude that Mr. Kaufman or one or more members of his family has a direct or indirect ownership or other financial interest in the tenant.

Finally, the plaintiffs have threatened litigation since at least February 15, 2001. In his letter of that date, Mr. Bloom stated that the letter from Mr. Feinstein of February 7, 2001, was an "invitation to litigation, which, if it becomes necessary, would likely be in the form of a class action on behalf of all of the investors/tenants-in-common." In his letter of March 15, 2001, Mr. Bloom stated that "we are in the process of consulting with counsel in Philadelphia with a view to instituting appropriate legal action."

In summary, by the end of the 2000-2001 correspondence, plaintiffs' counsel had concluded: (1) that Mr. Kaufman was an interloper with no right to act as Nominee or mortgage the property, (2) that Mr. Kaufman or a member of his family had a direct or indirect ownership or other financial interest in the property, (3) that Mr. Kaufman had no right to management fees and demanded that Mr. Kaufman repay all management fees and cease the payment of those fees. The plaintiffs' counsel had also demanded that Mr. Kaufman provide a full accounting for all of his actions in managing the property and had threatened

27

litigation on two occassions.  Viewing the evidence in the light most favorable to the plaintiffs, the statute began running on March 22, 2001, when the plaintiffs had made all of these allegations, demanded an accounting and twice threatened litigation.  Their time to bring an action arising out of those claims expired on March 22, 2003.  They filed this action on November 27, 2007.[9]

The plaintiffs, however, argue that they were unaware of their claims at the time of the correspondence because they had not read the Agreement at that time.  Transcript of June 24, 2010, Oral Argument at 23:11-16.  Counsel for the plaintiffs argued that, in order to appreciate the wrongfulness of Mr. Kaufman's occupation of the role of Nominee, Mr. Bloom needed to read the Agreement.  Id. at 23:18-21.

At his deposition, Mr. Bloom testified that he did not read the Agreement until sometime in early 2002.  Bloom Dep. at 48:14-49:3.  This would toll the statute of limitations for less than one year.  The limitations period would have expired in early 2004, and the plaintiffs' fraud claims would still be untimely.  Moreover, even if this fact was sufficient to

---

[9]    When asked by the Court at oral argument why suit was not brought earlier than 2007, counsel for the plaintiffs stated that "effective advocacy on the part of Mr. Kaufman's advocates . . . discouraged [the plaintiffs] and convinced them that maybe [the defendants are] right."  Transcript of June 24, 2010, Oral Argument at 26:14-24.  The effective advocacy of opposing counsel is no excuse for a failure to exercise reasonable diligence.

indefinitely toll the plaintiffs' limitations period, the details of the parties' correspondence shows that, through reasonable diligence, the plaintiffs should have known of the Agreement at the time of the correspondence.  In the letter dated March 13, 2001, Mr. Feinstein answered Mr. Bloom's question as to the document from which Mr. Kaufman derives his authority as Nominee by explaining that Mr. Kaufman's authority derived from the "Tenancy in Common Agreement."  If the plaintiffs did not know the details of that Agreement until 2002, their lack of knowledge derives from a failure to exercise reasonable diligence after receipt of the March 13 letter.

C.  Accounting and Receivership

The plaintiffs' claims against the Kaufman defendants for an accounting and receivership under count II are also time-barred, either by Pennsylvania's six-year statute of limitations for actions at law for an accounting or by the equitable doctrine of laches.[10]

Under Pennsylvania law, an action at law for an accounting has a limitations period of six years.  42 Pa. C.S. § 5527.  Although the plaintiffs state that their request for an

---

[10]    The Kaufman defendants also argue that these claims are barred by the doctrines of ratification, estoppel and waiver. Because the Court finds that the plaintiffs' claims in count II are barred by either the statute of limitations or laches, the Court does not reach these arguments.

accounting is a claim under equity and that the statute of limitations does not apply, "it is well established that equity will frequently adopt and apply the statute of limitations which controls analogous proceedings at law." Ebbert v. Plymouth Oil Co., 34 A.2d 493, 495 (Pa. 1943). This is especially true in situations, such as an accounting, where the cause of action is not exclusively cognizable in equity. In such cases, "[e]quity takes jurisdiction only when the accounts are mutual or complicated, or when discovery is needed and material to the relief." Id.

On August 14, 2009, the defendants provided the plaintiffs with an accounting for the six years prior to the commencement of the current litigation. Ex. DD; see also Kaufman Aff. at ¶ 27. The plaintiffs, however, demand an accounting for the entire period in which Mr. Kaufman acted as Nominee. To the extent that this request falls outside of the period for which the Kaufman defendants have already provided an accounting, the plaintiffs' request is not timely. The plaintiffs first demanded an accounting in their letter of January 18, 2001. The limitations period on their accounting claim, therefore, ran on January 18, 2007. This action was filed on November 27, 2007, over 10 months after the limitations period had run.

Even if the plaintiffs are correct and the statute of limitations does not apply to an action in equity for an

accounting, the plaintiffs' request for an accounting is barred
by the doctrine of laches.  Because statutes of limitations are
not applicable in actions in equity under Pennsylvania law, a
defendant must raise the defense of laches to bar an equitable
claim as untimely.  In re Mushroom Transportation Co., 382 F.3d
325, 337 (3d Cir. 2004).  Unlike statutes of limitations, the
doctrine of laches does not depend upon the passage of time
alone.  United Nat'l Ins. Co. v. J.H. France Refractories Co.,
668 A.2d 120, 124-25 (Pa. 1995).  Instead, a court must find (1)
a delay arising from the plaintiff's failure to exercise due
diligence, and (2) prejudice to the defendant resulting from the
delay.  Stilp v. Hafer, 718 A.2d 290, 293 (Pa. 1998).

In this case, the first prong of the laches inquiry,
delay arising from the failure to exercise due diligence, is
satisfied because the plaintiffs filed this action after the
applicable statute of limitations had run.  An applicable statute
of limitations can be used as guidance in determining whether an
action was timely under the first prong of the laches inquiry.
United Nat'l Ins. Co., 668 A.2d at 125.  As already explained,
this action was brought outside the limitations period.  The
plaintiffs provide no explanation for the delay, and the Court
must conclude that such delay arose from the plaintiffs' failure
to exercise due diligence and bring their claims in a timely
manner.

To establish the second prong of laches, prejudice, a party must show that some change in the condition or relations of the parties occurred during the period in which the plaintiff unreasonably failed to act. <u>Leedom v. Thomas</u>, 413 A.2d 649 (Pa. 1977). Prejudice can arise through the death of the principal participants in the transactions complained of, the death of witnesses or witnesses to the transactions, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible. <u>In re Wallace's Estate</u>, 149 A. 473, 475 (Pa. 1930); <u>Kern v. Kern</u>, 892 A.2d 1, 10 (Pa. Super. 2006). A change of circumstances barring relief has also been held to occur when evidence has been lost, or is more difficult to procure. <u>McGrann v. Allen</u>, 140 A. 552, 579 (Pa. 1928).

In this case, witnesses have died and evidence has been lost due to the passage of time. Lee Appel, plaintiff Rita Appel's husband and predecessor in interest, who was represented by Mr. Bloom during the 2000-2001 correspondence, has died. Leonard Appel, plaintiff Nanette Appel-Bloom's brother and predecessor in interest and the party who first consulted Mr. Bloom about issues concerning the property, has also died. Other witnesses' memories have faded with time and age. Plaintiff Ronald Appel, who first began questioning Mr. Kaufman's management of the property in 1997, has developed memory

problems.  See Appel Dep. at 84:24-85:11.  Mr. Bloom's deposition reflects that his memory of relevant facts also appears to have faded with time.  See Bloom Dep. at 15:11-20; 30:2-22; 31:12-32:6.

The plaintiffs, however, argue that, according to a Pennsylvania Superior Court case, Kehoe v. Gilroy, 467 A.2d 1 (Pa. Super. 1983), the Court may not find prejudice or delay in this action.  Kehoe concerned a suit brought by the beneficiaries of a trust against the estate of a deceased trustee for failure to pay the trust income due to the beneficiaries after the death of the trustee.  The trial court granted the defendants' preliminary objection that the doctrine of laches applied to the beneficiaries' claims.  On appeal, the Superior Court reversed, finding that (1) there was no clear showing that the defendants repudiated the trust or when the plaintiffs would have learned of such repudiation, and (2) there was no showing of prejudice because the defendants had not shown a change in the condition or relations of the parties during the period in which the plaintiffs failed to act.

Kehoe is inapplicable here.  The Superior Court's opinion in Kehoe focused on the insufficiency of the record at such an early stage of the litigation, and the failure of the defendants to establish the factual details of both delay and prejudice.  In this case, however, there is an adequate factual

record of both the circumstances of delay and the prejudice that
resulted from that delay.

D.   Declaration that Deeds and Mortgage Are Void

The plaintiffs seek a declaration invalidating: (1) the
1983 Quitclaim deed, (2) the 1999 deed from Mr. Kaufman to the
Kaufman Corporation, (3) the Aries mortgage, and (4) the
assignment of the Aries mortgage to Wells Fargo.  The plaintiffs'
declaratory claims, however, are barred by the two-year statute
of limitations for actions in fraud.

In the Court's Memorandum and Order of March 29, 2009,
deciding the defendants' motion to dismiss, the Court stated
that, according to the United States Court of Appeals for the
Third Circuit's opinion in Algrant v. Evergreen Valley Nurseries
Ltd. Partnership, a two-year statute of limitations for fraud
likely applied to the plaintiffs' declaratory claims.  126 F.3d
178, 184-85 (3d Cir. 1997) (holding that, because declaratory
relief based on common law fraud was barred to the same extent as
legal relief for such fraud, 42 Pa. C.S. § 5524(7) applied to a
declaratory claim brought by holders of securities).  The Court
of Appeals in Algrant held that, "when plaintiffs' claims are
barred by a statute of limitations applicable to a concurrent
legal remedy, then a court will withhold declaratory judgment
relief in an independent suit essentially predicated upon the

34

same cause of action." <u>Id.</u> The Court, however, did not definitively decide the issue, because the plaintiffs' knowledge of Wells Fargo's role in the allegedly fraudulent scheme was not supported by evidence.

The Court now decides that <u>Algrant</u> applies to the plaintiffs' declaratory claims and the plaintiffs' declaratory claims are subject to the two-year statute of limitations for fraud under 42 Pa. C.S. § 5524(7). The plaintiffs' claims in this case are for a declaratory judgment that, based upon the alleged fraud of Mr. Kaufman, the Aries mortgage is void. As the Third Circuit held in <u>Algrant</u>, the two-year statute of limitations for fraud applies to the plaintiffs' declaratory claims.

The plaintiffs, however, cite to <u>Kean v. Forman</u>, 752 A.2d 906 (Pa. Super. 2000), to argue for a general rule that, if a mortgage is void, it will always be void, despite the passage of time. The Superior Court's decision in <u>Kean</u>, however, was not so broad. In <u>Kean</u>, the plaintiff, the owner of the subject property, brought an action to quiet title because the defendant, a non-property owner, held a mortgage the clouded the plaintiff's title on the property. The Superior Court found actions to quiet title "cannot be subject to a statute of limitations, since the possessor's interest in the property is clouded by the questioned mortgage each day that it remains." <u>Id.</u> at 908. <u>Kean</u>,

therefore, was not an action for declaratory relief, but was specifically a quiet title action.  The opinion is silent as to the applicability of statutes of limitations to declaratory actions.

The plaintiffs also argue that, even if the statute of limitations applies, they were unaware of their causes of action because they were unaware of the Quitclaim deed, the deed transferring title to the Kaufman Corporation, and the Aries mortgage until they received copies thereof from their local counsel on October 27, 2008.  Before that time, the plaintiffs argue, they were not aware of the existence of such documents or that Wells Fargo was a potential defendant.

The plaintiffs, however, raised questions concerning both Mr. Kaufman's status as Nominee and the 1999 mortgage in the 2000-2001 correspondence.  Any lack of knowledge of these specific documents stems from the plaintiffs' failure to exercise reasonable diligence concerning Mr. Kaufman's management of the property, such as the execution of a title search.  The plaintiffs do not dispute that the documents in question have been available in the public record since, at the latest, June of 1999.  Nor do they dispute that both Ronald Appel and Mr. Bloom were experienced lawyers who knew that such documents were available by conducting a title search on the property.  The plaintiffs and Mr. Bloom had a responsibility to exercise

reasonable diligence to uncover any claims they may have had resulting from Mr. Kaufman's alleged fraudulent acts, including the documents that seek to invalidate.  They cannot use their failure to diligently research the details of their claims as a reason to toll the applicable limitations period.

The plaintiffs further argue that, because their claims allege no wrongdoing by Wells Fargo and are based purely on the alleged fraudulent acts of the Kaufman defendants, their claims against Wells Fargo have no limitations period.  The only reason to declare the Aries mortgage void, however, would be that the mortgage was fraudulently created by Mr. Kaufman.  That claim is time-barred.  There is no claim against Wells Fargo that is independent of the plaintiffs' fraud claims against the Kaufman defendants.


E.    <u>Partition</u>

The Court grants summary judgment for the Kaufman defendants on the plaintiffs' partition claims.

The Court has already held that the restraint on partition in the Agreement is for a valid and reasonable purpose. Paragraph 3 of the Agreement provides that "[t]he parties hereto . . . expressly covenant and agree that none of them shall at any time bring or prosecute any action, suit or proceeding for the partition of said real property or for a judicial sale thereof

without the prior written consent of all of the parties to this agreement." Ex. C.

The plaintiffs argue, as they did in response to the Kaufman defendants' motion to dismiss, that if the agreement creates an indefinite postponement of the right to partition, it constitutes an unlawful restraint on alienation. Hyatt v. Hyatt, 417 A.2d 726 (Pa. Super. Ct. 1980). The Court addressed this argument in its Memorandum and Order dated March 12, 2009, and stated that, under Pennsylvania law, partition rights may be restricted until the purpose for which the property was acquired had been fulfilled. Marchand v. Marsh, 280 Pa. 292 (1924); Appeal of Latshaw, 15 A. 676 (1888); Fuhrmann v. Doll, 451 A.2d 520 (Pa. Super. Ct. 1982). In this case, the 99 year lease was the clear purpose of the parties' agreement. The parties to the agreement, therefore, created a valid and reasonable restraint on the right of partition until the 99 year lease had been fulfilled.

The Court, however, did not dismiss the plaintiffs' partition claims because the plaintiffs "have alleged wrongdoing by a party to the Agreement and have previously expressed suspicions that the original Nominees may have had some improper interest in the finances of the property's tenant at the time of the original contract." Appel v. Kaufman, No. 08-392, 2009 WL 666793, *4 (E.D.Pa. Mar. 12, 2009). The Court stated that it

38

would consider the plaintiffs' partition claims "[i]f the plaintiffs are able to successfully pursue their claims for breach of fiduciary duty and fraud." Id. The plaintiffs, however, are unable to do so. Those claims are barred by the two-year statute of limitations for fraud.[11]

The plaintiffs also argue that, because the partition claim is an individual claim, and not a class action, and because all of the owners must actually be joined in the action and, if any of the tenants were to opt out of the partition claim, the Court would lose jurisdiction over the partition claims, the Court is without jurisdiction to make any order respecting the partition claims. The fact that all of the tenants must agree to partition under the agreement, however, has nothing to do with the Court's jurisdiction. It simply means that, under the agreement, unless all of the tenants agree to partition, the property may not be partitioned. The Court certainly has the jurisdiction both to (1) determine what the agreement says and (2) determine if the plaintiffs' partition claims are valid under the agreement. The citations provided by the plaintiffs in support of their argument are inapplicable. Those citations support the unrelated proposition that, although an action for partition may be brought by any one or more co-tenants, all other

_____

[11]     The plaintiffs also argue that the Kaufman defendants have no standing to defend against their partition claims. The Court finds no merit to that argument.

co-tenants must be joined as defendants.  Lohmiller v.
Weidenbaugh, 649 A.2d 578, 580 (Pa. 1983); Pa. R. Civ. P. § 1553.
The citations say nothing about the Court's jurisdiction over the
plaintiffs' partition claims.

An appropriate order follows separately.